Argued April 20; reversed May 23; rehearing denied
September 6, 1939

CREDIT SERVICE CO. *v.* FINNE

(90 P. (2d) 743)

In Banc.

*W. B. Layton* and *Wm. C. Ralston*, both of Portland (Layton & Boyrie, Lester L. Ahlgrim, and W. C. Ralston, all of Portland, on the brief), for appellant.

*Geo. P. Winslow*, of Tillamook, for respondent.

BELT, J. Plaintiff, a corporation engaged in the business of collecting assigned accounts, commenced an action on April 26th, 1938, to recover for goods sold and delivered by its assignor, Weyenberg Shoe Mfg. Company, to the defendant who for several years had been engaged in the retail shoe business at Tillamook, Oregon. It is alleged that between and including September 5th, 1934 and March 28th, 1938, the goods sold were of the agreed value of $11,317.32, and that no part thereof has been paid except the sum of $10,472.06, leaving a balance of $845.26 due and owing.

The defendant by a plea in abatement avers that the account is not due by reason of an agreement for extension of credit. The defendant alleges:

" * * * * * that all of said shoes and goods were sold to the defendant upon the understanding and agreement that as long as defendant continued to do business with said Shoe Company and to continue to order substantial amounts of shoes and goods that said Weyenberg Shoe Mfg. Company would not require defendant to reduce defendant's account for said purchases to less than approximately $900.00 and that said Weyenberg Shoe Mfg. Company would carry defendant and extend to defendant credit on account of said purchases by defendant up to approximately $900.00"

Defendant further alleges that he complied with the terms of the above agreement in that he continued to do business with the wholesale shoe company and to order substantial amounts of goods therefrom and that said agreement to extend credit has never been

terminated but was in full force and effect at the time of the commencement of the action.

The plaintiff in its reply denied that any such agreement for extension of credit had been made with the defendant.

On these issues thus briefly stated, the cause was submitted to a jury and a verdict returned in favor of the defendant. Based on such verdict, the court entered a judgment abating and dismissing the action. From this judgment, the plaintiff appeals.

The principal contention of the appellant is that: (1) The plea in abatement is insufficient in that the alleged agreement for credit is void for indefiniteness and uncertainty; and (2) there is no substantial evidence tending to show that the alleged agreement was ever made or that, if made, the defendant complied therewith.

■ It will be assumed that this most unusual agreement for credit as alleged is not void for indefiniteness and uncertainty. The court prefers to base its decision on the lack of substantial evidence to support the agreement as alleged. We are not unmindful that, if different reasonable inferences relative to such issue may be drawn from the evidence, the finding of the jury in reference thereto is conclusive. Neither do we fail to take cognizance of the equally well established rule that pleas in abatement are not favorites of the law and that such pleas, being dilatory in nature, must be definite and certain. If the pleadings must be of such character it would seem logically to follow that the proof must likewise be definite and certain: *Credit Service v. Korn*, 121 Or. 685, 256 P. 1047; *Walker v. Hewitt*, 109 Or. 366, 220 P. 147, 35 A. L. R. 100. Juries can not be turned loose to indulge in speculation and

conjecture, but their findings must be based upon substantial evidence.

The defendant invested $800 or $900 in a retail shoe business and commenced dealing with the Weyenberg Shoe Mfg. Company in September, 1934. The company, through its credit manager, Mr. Martin, told him, according to the defendant, that "they could increase my credit as my business grew and buy from them." The balance due on his account at the close of 1934 was $104.35; at the end of 1935, it was $1,170.99; in 1936, it was $1,218.75; 1937—$957.74; and in 1938—$845.26. Although in his answer the defendant alleges that "all of said shoes and goods" were sold to him under the credit agreement—the account being from September 5, 1934, to March 28, 1938—he testifies that the "$900 credit extension" agreement was not made until June 9, 1937, being the date of a letter written by the shoe manufacturing company to him in reference to his account. In response to the question, "Did you ever have any written agreement with the Weyenberg Shoe company that you would have a credit extension, a letter of credit on their books to the extent of $900.00?" the defendant answered, "Just the letter from Mr. Martin (credit manager), or verbal agreement with him." The letter in question, so far as is material herein, is as follows:

"I am enclosing your June first statement showing the condition of your account at the present time. You will notice that the past due indebtedness in the ninety days and over ninety columns is quite substantial, amounting to over $800.00

"We must keep in mind, Mark, that this will all have to be taken care of before we can show consideration of fall orders. I was checking them this morning and find that these fall orders amount to almost

$2,000.00 and this means that very substantial payments are going to have to be made from now until the first of August in order to bring your open balance to where it should be, namely; *approximately $900.00, which is the basis on which your account turned last year.''* (Italics ours.)

Under no theory could the action be abated for the amount due on the account prior to June 9, 1937, and we do not think the letter, when reasonably construed, tends to show any agreement as alleged for $900 credit as long as defendant continued to do business and "to order substantial amounts of shoes" from the wholesale company. It is true that defendant did not necessarily have to rely upon the letter—although as a matter of fact he did—but there is no evidence of a definite and certain character of any oral agreement such as alleged.

As we view the above letter, particularly the part thereof which we have italicized, defendant had a credit which fluctuated according to the amount of business he transacted with the shoe company. In 1936, defendant purchased goods amounting to $3,705. Hence, $900 was a reasonable credit standing on the basis of such business turnover. If defendant's business sales had amounted to only $500 for the year 1936, would it be reasonable to say that he should have a credit standing of $900?

This is not a case where a seller who has lulled a buyer into a false sense of security by extending liberal terms of credit suddenly and unexpectedly demands the "pound of flesh." Weyenberg Shoe Mfg. Company continually cautioned the defendant about the status of his account and the necessity for reducing his indebtedness. The following excerpts from correspond-

ence between them render any other contention untenable:

May 24, 1937—Weyenberg Co. to Finne:

"Last week I made an analysis of your account based on last year's purchases to determine the number of turns the account was being given, with the following results:

"Your purchases in 1936 amounted to $3705.00. Your balance on January 1, 1937 was $1264.85. This meant that the account was turned only 2.92, whereas, it should be from three and one-half to four. *On the basis of a four-time turnover your balance at all times should not be in excess of $900.00 * * *.*"

June 23, 1937—Weyenberg Co. to Finne:

"* * in order to have an equitable reduction of the excessive overdue balance it is going to be necessary for us to have payments from you on a 3 to 1 basis—that is, $3.00 for every $1.00 purchase. This is the only way we will ever get the account down to where it belongs *on a basis of last year's turnover,* which was 2.9 or an outstanding balance of $900.00

"We will, therefore, be obliged to hold this mail order until additional payments have been received from you to equal approximately three times the amount of the order. * * * *

"I regret exceedingly, Mark that it is necessary to hold you down in this manner, but it is the only plan under present conditions that will enable us to get back to *a satisfactory turn of the account* * * * * ."

October 12, 1937—Weyenberg Co. to Finne:

"It is our desire, Mark, that this balance be brought down to around $900.00 and held at that point. This will then represent a satisfactory *turn* on the account based on last year's purchases of approximately $3,600."

January 19, 1938—Weyenberg Co. to Finne:

"* * * Your stock is $500.00 less than it was a year ago, and your sales are approximately $1600.00 less.

"This means that you have lost sales due to the lack of salable merchandise, and in turn this lack of merchandise has been due to the *weakened financial condition which made it necessary to curtail the extension of credit you have enjoyed in previous years.*

"* * * If such a loan cannot be made, then to be very frank with you, there is only one other thing to do and that is to *liquidate* the business and get what we can out of it."

January 21, 1938—Mr. Finne to Weyenberg Co.:

"* * * just what we should do *to restore our credit with you,* and to find some means of doing same is a task not to be minimized.

"We appreciate sincerely the kindness and help which has been extended to us thru you personally, in the past * * * *.

"Thanking you for your past kindness and *long-suffering patience,* * * ."

April 9, 1938—Weyenberg Co. to Finne:

"* * * Frankly Mark there is absolutely nothing in the picture you have given us that warrants our going along as we have since the first of the year. The figures you have given us show that on a basis of a 30% mark-up your expenses have been more than your profit, and your stock has been reduced almost $300.

"In view of this and in all fairness to both you and ourselves as the largest creditor, we have today turned the account over to the Portland Association of Credit Men and Mr. Ingram, one of their representatives will call on you sometime Monday * * * * * *."

On April 16, Mr. Finne wrote the Adjustment Bureau stating that his uncle—to whom he had applied

for a loan to tide him over—had refused to assist him, "as my uncle doesn't feel that under existing conditions he can help me. He feels there would be no assurance that others I owe might not take action before I could get squared up *so I guess the issue is in your hands.*" (The italics in the above quoted correspondence are ours.)

It is true the defendant testified that the credit manager, Mr. Martin, told him on several occasions that he could "have credit up to $900.00" but it does not appear upon what terms or for what duration such credit would be established. It is left entirely to conjecture whether it would be as long as defendant continued to do business and gave substantial orders for goods. In other parts of the testimony of the defendant he speaks of an entirely different arrangement stating that he could have credit up to $900 and that he could pay the account "as he sold the goods." Witness the following portion of the record:

"Q. Mr. Finne, in the conversation you had with reference to this $900.00 credit, how long was this $900.00 credit to run? A. As long as I bought merchandise from them and carried that amount of stock on hand.

\* \* \* \* \*

"Q. You claim you had the right to pay this, as and when you sold the shoes, is that true? A. Yes, sir.

"Q. If you never sold the shoes you would never have to pay for them? A. They would have the merchandise, yes.

\* \* \* \* \*

"Q. \* \* I ask you if you had an understanding either oral or written that if you didn't pay for any shoes sold to you by the Weyenberg Shoe company that you had the right to return them? A. Yes, sir.

"Q. You had that agreement—with whom? A. I would ship them back, that is all.

"Q. With whom? A. With the company, they would take back the shoes if I sent them back.

"Q. With what person representing the company did you have that agreement? A. Martin or Brewster, either one that I would ship them back.

"Q. Brewster was a salesman? A. Yes, sir.

"Q. Did he have any right to make that agreement? A. No, sir.

"Q. Did Mr. Martin ever make that agreement with you? A. Not altogether.

&ast; &ast; &ast; &ast; &ast;

"Q. If you didn't ship them back you wouldn't have to pay for them? A. No, sir.

"Q. That was a pretty nice arrangement? A. Fine.

&ast; &ast; &ast; &ast; &ast;

"Q. And you want the jury to understand that you could owe that $900.00 indefinitely? A. Not indefinitely, no sir.

"Q. Then they had you over a barrel, they could make you borrow money to buy more shoes if they wanted to, in order to keep that $900.00 alive, is that right—that credit? A. They would let the old account stand.

"Q. How much regularly would you have to buy shoes to keep that $900.00—if that was the arrangement you had with them—how much would you have to buy from them during any particular month? A. How much would I have to buy?

"Q. Yes. A. There was no stipulated amount, just so I bought a fair amount of shoes over the time."

■ In the light of the above testimony, can it be said that the defendant has established with certainty and definiteness the contract as alleged in the answer? Obviously, the reply is no. Which one of the theories was the jury to believe—that the goods were sold on consignment or that they were sold upon credit?

After the account was assigned to the plaintiff, the defendant made every effort to obtain loans for the purpose of reducing his indebtedness with the shoe company. Being unsuccessful, he wrote to the plaintiff on April 16, 1938—only ten days prior to the time this action was commenced—that "the issue is in your hands." At this time the balance of his account was less than $900. It would seem reasonable that, if he had the agreement as alleged, he would have called their attention to the same.

We can only conclude, after careful consideration of the entire record, that the agreement for extension of credit as alleged was merely an afterthought.

It follows that the judgment of the lower court is reversed and the cause remanded with directions to dismiss the defendant's plea in abatement.

Lusk, J., not sitting.